Good morning. My name is Kate Galston. I'm here for the petitioner. Good morning. I'd like to reserve three minutes. Sure. Good morning. Our client, Jimmy Nunez-Castro, is an evangelical Christian. In Honduras, he was a member of an evangelical Christian church and a leader of an evangelical Christian youth group. Did you see the letter that the government sent? Yes. Yes, and we actually submitted a response yesterday. I think it crossed paths with the order that you issued, Your Honor. I have copies of that letter, if you'd like me to. What's the gist of it? I'm sorry? What's the gist of it? The gist of it is that we don't think that there's any mootness problem here. The Court has jurisdiction. And as the Court noted in its order that the reforms in 1996 didn't include the old jurisdiction stripping provision. I think it's clear that we retain jurisdiction even if they're deported. Yes. I'm not clear on whether there's authority that says we retain jurisdiction if they leave voluntarily. Is there? I'm not aware of any distinction that has been drawn. My understanding is that there's – Well, should there – I'm thinking maybe there should be. It seems like it's different. If somebody says, I don't dare go back to Honduras, they'll kill me. And then he says, oh, you know, I think I'll go back to Honduras. That's very different from if he says, I don't dare go back to Honduras. I think they'll kill me. And then we drag him kicking and screaming onto an airplane and fly him back to Honduras. I understand that concern. So that would support making a distinction. That's why I'm asking if there's authority. It would, but I think that's a very fact-specific determination that's going to have to be made. The BIA or the IJ would have to make such a factual determination because there might be circumstances – and I believe there's cases where someone might leave the country for a specific reason, but various – there might be a presumption as to whether that indicates a lack of fear. But – I mean, it seems to me the statute gives us statutory jurisdiction. I don't have a problem with that. Yes. But there are, as Judge Kleinfeld says, as you say, there are factual circumstances that can render a case moot even though the court has jurisdiction. Suppose he died, for example. You know, if he had died, it's moot. Suppose he was elected president of Honduras in exile and wants to go back, you know. Be there any number of circumstances, even though the court has jurisdiction, but factual things that render the case moot. I understand your point. So if he goes voluntarily – they say he went voluntarily back. Yes. If he went voluntarily back, why wouldn't it be moot? Factually. It wouldn't be moot – the issue before this Court wouldn't be moot. Wait. Issues don't get moot or not. Cases get moot or not. Yes. And that's different. Well, he would still – Let me ask you first. Okay. Is it disputed or conceded or established that he went back to Honduras and did so voluntarily? Well, as I notified the government as soon as we learned of his intention to return to Honduras, and he left Honduras on his own accord. The government didn't force him to go to Honduras. Wait. He said he left – I'm assuming it was a slip of the tongue. I'm sorry. I misspoke. He left the United States on his own accord. Okay. So it is conceded that he voluntarily went back to Honduras. Yes. So why wouldn't the question whether he has a well-founded fear of persecution or torture in Honduras be mooted out by the fact that he voluntarily went back to Honduras? Those are factual questions that are beyond the scope of what the Court is reviewing here. Why? I mean, why isn't that analogous if he was dead? Let me finish what I'm trying to lay out because I may not be doing it clearly for you. I'm thinking if he's dead, there would still be an issue whether with the sort of BIA should or should not decide that there's a well-founded fear. The issue would be established by the record. But for the particular guy, he'd have no risk of being persecuted or tortured by going back to Honduras if he was dead. Whether he went back or not, they wouldn't persecute him if he was dead. So why – so that would moot out the case. And I don't think we'd have to send it to the BIA to find out whether that moots it out. Would we? I think this is a different – he's not dead. I mean, this is a different circumstance. Okay. But if he voluntarily goes back. But there still would be – he still would have the opportunity to introduce facts as to why he went back. What – you know, he might have specific circumstances. You know, I've seen cases where a death of a relative or a severe illness or specific factual circumstances that then are presented to the BIA or the I.J. who was ever making that determination. And then the determination is made as to whether that undercuts that fear of persecution that the applicant is claiming. Oh, I see. You're saying it could be that a person with a well-founded fear would nevertheless go back if he heard that his sister was dying and wanted to see him one more last time, something like that. Or, I mean, as this case – this is a – as our claim is a religious persecution claim in this case, and the nature of the United States' protection for the freedom of religion is that people are able to preach and follow their religious practices openly. Well, our First Amendment doesn't apply to Honduras. They don't have to grant religious freedom. No, I understand that. I'm saying the basis of why religion is protected in our asylum and refugee laws is because of the United States' history of protecting religious freedom. So if you had a case where someone was, you know, in their home country but was – Actually, it isn't. It all arises out of the St. Louis. Well, my point – Are you familiar with that? My point is that – These laws – this was written as a U.N. convention right after World War II, and it was addressed to the ethnic and religious discrimination by the Nazis against the Jews. It was not about making sure that everybody could have freedom of religion in their own land. The Muslim countries would never have signed on to it if it allowed conversion to Christianity, for example. I understand your point. My point is only that there could be circumstances where someone would be in their home country, but the reason why they wouldn't fear persecution is because they abandoned their, you know, their religion. They hid under the radar. I'm just giving a, you know, possible example. So these are – but these are all fact-based questions, and, you know, we did mention that in our letter, and we would – What would the BIA do? Would he fly back to the United States and tell the BIA why he went back to Honduras? Well, my understanding is that because of the fact that departure no longer – it doesn't affect the jurisdiction of a pending petition, this is an issue that comes up in proceedings and people do come back to the United States to address these issues on remand. And, of course, you know, if the Court made a determination – this – the appeal that we briefed was all – Could he get in to appear in front of a BIA – the IJ? I'm assuming there's provisions for that, but – It's me. I'm asking you. Well, I'm – we were appointed as pro bono counsel on – for this petition for review. You know, I'm not sure what the trial procedure – the remand procedures would be, but obviously, we would investigate that. And the Court has invited supplemental briefing, and if the Court would still like supplemental briefing and allow us the opportunity to further delve into these issues, then we're happy to provide that, because this was an issue, obviously, that was raised two days before oral argument, even though we notified the government last February that this was his intention. Thank you. Do you want to save your minute and a half? Okay. Thank you very much. Good morning. Good morning. May it please the Court. Lindsay Murphy on behalf of the Attorney General. Your Honors, I would like to apologize for only notifying the Court last minute of the Petitioner's departure to Honduras. I only learned of this fact while Ms. Galston is correct. I don't care about when you personally learned it, but it sounds like the government learned it a year ago, and we're sort of a day late, or at least I am a day late and a dollar short on preparation. Yes. I don't know the answers to the questions I asked your opposing counsel. Maybe you can help me on it. Basically, it's the government's position that, you know, as the Supreme Court stated in Niken, an alien can pursue a petition for review challenging their final removal order while they're outside of the United States. However, because this Petitioner has voluntarily departed the United States, it's the government's position that his asylum claim is effectively rendered moot. Do you have any authority? I mean, government position is just what they would like us to adopt. It doesn't have any authority. Do you have any authority for that? Code of Federal Regulations 8 CFR 1208.8, Sections A and B. Say it again, please. 8 CFR 1208.8, Subsections A and B. And you also cited a case in your letter, didn't you? Cower v. Holder, and that relates to a claim for withholding removal in cat protection. A says that an applicant who leaves without obtaining parole shall be presumed to have abandoned his application, and B says an applicant who leaves and returns to the country of claim persecution shall be presumed to have abandoned his application unless the applicant is able to establish compelling reasons for such return. That would seem to support your adversary's position that it's factual, there could be a compelling reason for him to face the risk, so we can't say it's moot. It sounds like a rebuttable presumption rather than an irrebuttable presumption. Yes, Your Honor. And the government would not be opposed to remanding this case for the purpose of having the Board address the issue of the effect of the Petitioner's voluntary departure on his asylum claim and his withholding in cat protection claims also. Would this be treated, would his voluntary departure be treated as having abandoned his appeal? Abandoned his petition for review? Yeah. No. So what about the finality of the decision by the BIA that denied him asylum? Would that, would you claim, if he is found in this country again, which sometimes happens, would, and claimed asylum, would you claim that that was res judicata, that he was properly denied asylum and that would be a final decision? We would, Your Honor. And because of the fact that he has left, I think there, you know, there is a valid argument to make, and it could be left to the Board to determine in the first instance that he did in fact abandon his asylum application and that he would be prevented from filing again. What a, I don't see why that would follow. It seems like he could say, well, I went back because my sister was dying. I had to see her one last time. I knew it was very dangerous for me. I did it. It was dangerous. I got out of there as fast as I could after the funeral. It seems like he, if his petition is not otherwise unpersuasive, I don't really see why the interruption by the voluntary abandonment in that circumstance would mean that he's just out of luck on his petition. Well, I guess that would be a factual determination for the Board and for DHS to present any evidence showing that his return, despite its reasons, negated any claimed fear that he has. So what we would do is maybe remand but direct that the case come back to this panel if they decide that the presumption was rebutted and he did not abandon his application. I think that would be fine. Would Your Honor like me to address the merits of the Board's decision? Yes. Okay. Well, the record does not compel the conclusion that a protected ground was or would be one central reason motivating the gang leader, in this case Walter, to harm the petitioner. Instead, substantial evidence supports the conclusion that the gang leader targeted Mr. Nunez-Castro solely because he was siphoning gang members from the gang. Furthermore, the agency properly considered all of the evidence in denying Mr. Nunez-Castro's applications for asylum, withholding of removal, and protection under the Convention Against Torture, and the government requested that Petition Preview be denied. Well, what's your – if you had your druthers, would you have us reach the merits and sort of tear up the 28J letter of mootness or send it back for factual determination? I think it would be more efficient to send it back for a factual determination on mootness, because it really – I don't see that there is – you know, if a petitioner has voluntarily returned to his home country, there's no evidence of him having returned to the United States. It really doesn't seem like he would be able to rebut any presumed – any presumption that he no longer has a fear of harm in Honduras. Fair enough. Thank you. Thank you very much, Ms. Murphy. Ms. Galston, I think you have about a minute and a half left. What would you have us do today? Reach the merits or send it back to see if it's moot? I think that this is an important issue on the merits. It's been fully briefed on the issue of nexus, and I think we have a very strong argument that the government is saying here that – Important issues are the kind that we often like to dodge. I'm sorry? Important issues are the kind that courts often like to dodge. I understand that. Even for a case where they have to be decided. I understand that. But in this case, we have a situation where the board and the government is saying, well, it really – it doesn't really matter that this – that there is all of this evidence in the record of, you know, his – that – Look, I didn't really see that it was – it was overwhelming for you. It looked to me like you could say they were persecuting him because they didn't like all that Jesus stuff. But you could also read the record to say most of the country is Catholic. He's Catholic. They don't care if he's Catholic. They don't care if he's religious. They don't care if he's talking about Jesus. What they do care about is he's siphoning gang members off so that they're not working for the gang anymore. It's kind of like if Microsoft is poaching on Apple's employees as far as the gang is concerned. So it's not from the gang's standpoint, which under Elias Zacharias is the standpoint that matters, not from the gang's standpoint, that they're persecuting him for his religion, which they're indifferent to. They're persecuting him from the gang's standpoint for interfering with personnel retainment. Why can't the record be that – read that way? And if it is read that way, why, under the standard of review, don't we have to let it stand? Well, this – I don't think that the record necessarily has to be read that way. It doesn't necessarily have to be read that way. But if it can be read that way, we have to defer to the agency. Well, I think that – I mean, here we're talking about one central reason for the prosecution. The law is not – the government seems to be saying that the fact that there is a possible unprotected reason discounts evidence of a protected reason. But the – as this Court has said, there's no requirement that the Petitioner prove a dominant reason or that one reason was more important than the other. The standard is one central reason. And I – the evidence in this case cannot be divorced from the fact that he is a Christian evangelical whose mission is to – Why can't it be? Well, I mean, I don't think we can just say that he's – the way he practices his religion is by trying to convert other people, by preaching his faith in the streets, by inviting young people, including gang members, to come with him and listen to testimonies of people who have converted to his faith. Is there any reason to doubt that the gang members are also Christians and go to church? I – I don't – I don't have – there's no evidence – there's no record evidence of that, Your Honor. I mean, the record suggests that – I think there is. I think the country report. It's a Christian country. Well, it is a Christian country. But his work was – it was specific to the fact of his Christian evangelical faith, and that was the context within which he's preaching to these gang members. And on your question on – If you finish your answer, then I think you're out of time. Okay. I'm – I apologize, but I'm forgetting that there was a second part of your question. But – No, you've addressed the things I raised. I have addressed it. Okay. Well, thank you very much. Thank you. Thanks to both counsel and – And should we still plan to submit a supplemental brief? I don't need it. No, thank you. But I did want to thank you and your firm for taking this case on a pro bono basis. We appreciate it. Thank you.
judges: Goodwin, Kleinfeld, Silverman